UNITED STATES DISTRICT COURT FILED-ED4
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION    03 OCT -7 PM 4: 22

CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| EZRA BIRNBAUM, Individually and on Behalf of All Others Similarly Situated, | ) |
| | )CIVIL ACTION NO.  03C  7095 |
| Plaintiff, | ) |
| | ) |
| | )CLASS ACTION COMPLAINT |
| vs. | )FOR VIOLATIONS OF |
| | )FEDERAL SECURITIES LAWS |
| MIDWAY GAMES, INC., NEIL D. NICASTRO, THOMAS E. POWELL, KENNETH J. FEDESNA, UBS WARBURG LLC, GERARD KLAUER MATTISON & CO., INC., and JEFFERIES & COMPANY, INC., | ) |
| | ) |
| | ) |
| | )JURY TRIAL DEMANDED |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

JUDGE HOLDERMAN

MAGISTRATE JUDGE MASON

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the public documents and announcements made by Defendants, Securities and Exchange Commission ("SEC") filings, and press releases regarding Midway Games, Inc. ("Midway" or the "Company"), alleges, for his Complaint as follows:

DOCKETED
OCT 8 2003

## NATURE OF THE ACTION

1.      This is a federal securities class action brought by the Plaintiff on behalf of himself and a class consisting of all other persons (the "Class") who purchased the publicly traded securities of Midway (NYSE: MWY) between December 11, 2001 and July 30, 2003, inclusive (the "Class

Period"), including those who purchased or acquired shares in connection with the December 11, 2001 initial public offering (the "Offering"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.　　The interactive entertainment sector is highly competitive and characterized by the continuous introduction of new titles and the development of new technologies. A developer's ability to compete successfully is based in large part on the company's ability to (1) select and develop popular titles, (2) identify and obtain rights to commercially marketable intellectual properties, and (3) adapt products for use with new technologies.

3.　　Industry analysts report that development costs and cycle length in the interactive entertainment sector have increased significantly between 2001 and 2002, making it paramount for publishers to closely manage the development process. To cope with these issues,

> [m]ost major publishers have initiated "Greenlight" processes that enable senior management to monitor on-going costs, progression of creative design and overall gameplay for individual titles on a regular basis. **With most publishers having more than 100 titles in actived development, this can be a daunting task but is one which [Thomas Weisel Partners] believe is essential to a sector that is becoming more fiscally responsible.**

Thomas Weisel Partners, <u>Entertainment Software: A White Paper on the Interactive Game Publishing Industry</u> (2002) (emphasis added) (hereinafter referred to as the "White Paper").

4.　　Moreover, unit sales for new titles are heavily skewed toward the first few weeks following the product's release. The White Paper emphasized:

> **Unit sales for titles are front-end loaded, with over 50% of sales recorded in the first 2 weeks.** Particularly in case of franchise titles, gamers know when new titles are scheduled to be released . . . This reinforces our belief that investors should evaluate the pipeline of

> game publishers and watch for initial data on new releases,
> particularly when a title is a publisher's marquee title.

Id. (emphasis added).

5.      The combination of increased development costs and longer product cycle length with

front-loaded sales profits has created a strong correlation between the release of a marquee title and

an interactive entertainment company's earnings per period.  Thus, the timely release of new titles is

crucial to the Company's ability to meet its earnings expectations for any given period.

6.      Throughout the Class Period, Midway materially misrepresented the release dates of

critical products, which in turn led to the Company's inability to meet its earnings expectations.  As

discussed in detail below, Midway failed to disclose and/or misrepresented the operating problems

within its studios regarding the development and release of its products and failed to disclose the fact

that it was currently experiencing decreased demand for its products, resulting in the Company's

inability to meet revenue and earnings guidance provided by Defendants for fiscal 2002 and beyond.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 11, 12 and 15 of the Securities Act, 15

U.S.C. §§ 77k and 77(l)(2), and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b)

and 78t(a), as well as Rule l0b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-

5.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§§ 1331 and 1337, Section 22 of the Securities Act, as amended, 15 U.S.C. § 77(v), and Section 27

of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to Section 22 of the Securities Act, Section

27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the

preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Midway conducts business in this District.

10. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

11. The securities at issue in this action are shares of Midway, including those sold in the Offering. These shares were registered with the SEC pursuant to a registration statement (the "Registration Statement") and offered pursuant to an offering prospectus declared effective on and dated December 13, 2001 (collectively, the "Prospectus").

## PARTIES

12. Plaintiff Ezra Birnbaum purchased Midway securities in connection with the Offering, as set forth in the accompanying certification attached hereto and incorporated herein by reference, and has suffered damages as a result of the wrongful acts of Defendants as alleged herein.

13. Midway is a corporation organized and existing under the laws of Delaware with its principal place of business located within this judicial district at 2704 West Roscoe Street, Chicago, Illinois 60618.

14. Neil D. Nicastro ("Nicastro") was, at all relevant times during the Class Period, the Company's President, Chief Executive Officer, and Chief Operating Officer. Nicastro signed the Registration Statement.

15. Thomas E. Powell ("Powell") was, at all relevant times during the Class Period, the Company's Executive Vice President, Chief Financial Officer and Treasurer. Powell signed the Registration Statement.

4

16.     Kenneth J. Fedesna ("Fedesna") was, at all relevant times during the Class Period, the Company's Executive Vice President of Product Development and Director. Fedesna signed the Registration Statement.

17.     Nicastro, Powell and Fedsna are collectively referred to hereafter as the "Individual Defendants." During the Class Period, the Individual Defendants, as senior executive officers and a director of Midway were privy to confidential and proprietary information concerning Midway, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material, adverse, non-public information concerning Midway as discussed in detail below. Because of their positions with Midway, the Individual Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and communications with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in, and as co-conspirators with respect to, the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and a director were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the

5

Individual Defendants were able to and did, directly or indirectly, control the conduct of Midway's business.

19.     Defendant UBS Warburg LLC ("UBS") was one of the lead underwriters in the Offering and sold 2,638,000 shares of Midway stock in the Offering.

20.     Defendant Gerard Klauer Mattison & Co., Inc. ("Gerard") was one of the lead underwriters in the Offering and sold 1,053,600 shares in the Offering.

21.     Defendant Jefferies & Company, Inc. ("Jefferies") was one of the lead underwriters in the Offering and sold 658,400 shares in the Offering.

22.     Defendants UBS, Gerard, and Jefferies are collectively referred to as the "Underwriter Defendants."

23.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

24.     As senior executive officers and/or a director and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and which was traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Midway's financial condition and performance, growth, operations, financial statements, business,

6

products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Midway's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Midway's securities by disseminating materially false and misleading statements and/or concealing material, adverse facts. The scheme: (i) deceived the investing public regarding Midway's business, operations, and management and the intrinsic value of Midway securities; and (ii) caused Plaintiff and the other members of the Class to purchase Midway's securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased the securities of Midway during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Midway securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of

7

members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Midway or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28. Plaintiff's claims are typical of the claims of the Class, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

29. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class and securities litigation.

30. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public, including statements made in the Prospectus, during the Class Period misrepresented material facts about the business and operations of Midway; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

31. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs

done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

32.     Midway is a leading developer and publisher of interactive entertainment software.

Midway and its predecessors have been in the business of creating videogames for more than 20

years and have published more than 400 titles in that time. Midway has published videogames for

every major platform, including Sony's Playstation, Nintendo 64, Super NES, Game Boy, Game Boy

Color, Sega's Dreamcast, Saturn and Genesis, and coin-operated arcade games.

### Materially False and Misleading Statements Made During the Class Period

### Background

33.     The Class Period begins on December 11, 2001. On that date, the Company issued

the Registration Statement and filed it with the SEC on Form S-3/A with respect to its offering of 4.5

million shares. The Registration Statement was signed by all the Individual Defendants. Therein,

the Company stated:

> Our game development personnel are organized in teams. The
> producers manage the work of the other team members and are
> responsible for the overall design of the game. Each concept is
> reviewed initially for technical feasibility and evaluated relative
> toseveral factors, including whether the proposed product fits within
> our general strategy and profitability objectives. **Our management
> team meets regularly to formally review and evaluate the
> progress and quality of each title in development.** (Emphasis
> added.)

34.     On December 19, 2001, Midway announced the successful launch of its Offering of

4,500,000 shares of common stock at $15 per share, in which it obtained net proceeds of

9

approximately $63.3 million. The Company also stated its intention to use the net proceeds of the

offering for product development, working capital and other general corporate purposes.

35.     On February 25, 2002, the Company issued a press release wherein it reported that

revenues during the quarter ended December 31, 2001 were $43,720,000, down from $76,995,000 in

the prior year period. The net loss during the December 31, 2001 quarter was $305,000 or $0.01 per

share excluding preferred stock charges, compared with a net loss of $3,011,000 or $0.08 per share,

in the prior year period.

36.     Importantly, the Company provided the following guidance:

> **For the fiscal year ending December 31, 2002, Midway expects to ship over forty new home videogame products, including highly anticipated games such as Mortal Kombat: Deadly Alliance, Freaky Flyers, MLB SlugFest 20-03, and Defender. The company anticipates net sales of $330 million to $340 million for the full year.** (Emphasis added.)

37.     Moreover, the Company announced the following release schedule for 2002:

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 3/31/02 | NFL Blitz 20-02 | Gauntlet Dark Legacy NFL Blitz 20-02 SpyHunter | NFL Blitz 20-02 SpyHunter | |
| 6/30/02 | Fireblade Gravity Games BMX Legion: Legion of Excalibur MLB SlugFest 20-03 Red Card Soccer | Gravity Games BMX Red Card Soccer | Gauntlet Dark Legacy Gravity Games BMX Red Card Soccer | SpyHunter |
| 9/30/02 | Mortal Kombat: Deadly Alliance NFL Blitz 20-03 NHL Hitz 20-03 | MLB SlugFest 20-03 Mortal Kombat: Deadly Alliance NFL Blitz 20-03 NHL Hitz 20-03 | MLB SlugFest 20-02 Mortal Kombat: Deadly Alliance NFL Blitz 20-03 NHL Hitz 20-03 | NFL Bliz 20-02 |
| 12/31/02 | Defender Dr. Muto | Defender Dr. Muto | MLB SlugFest 20-02 Mortal Kombat: | Mortal Kombat: Deadly Alliance |

10

| | Freaky Flyers NBA Basketball | Freaky Flyers NBA Basketball | Deadly Alliance | |
|---|---|---|---|---|

38. On March 28, 2002, Midway filed with the SEC its half-yearly report on Form 10-KT405 for the six-month period ended December 31, 2002, reflecting the Company's transition of its fiscal year from a fiscal year ending on June 30th to a fiscal year ending on December 31st. The Company's Form KT405, signed by the Individual Defendants, reaffirmed the Company's previously announced 2002 release schedule:

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 3/31/02 | NFL Blitz 20-02 | Gauntlet Dark Legacy<br>NFL Blitz 20-02<br>SpyHunter | NFL Blitz 20-02<br>SpyHunter | |
| 6/30/02 | Fireblade<br>Gravity Games BMX<br>Legion: Legion of Excalibur<br>MLB SugFest 20-03<br>Red Card Soccer | Gravity Games BMX<br>Red Card Soccer | Gauntlet Dark Legacy<br>Gravity Games BMX<br>Red Card Soccer | SpyHunter |
| 9/30/02 | Mortal Kombat: Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | MLB SlugFest 20-03<br>Mortal Kombat: Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | MLB SlugFest 20-02<br>Mortal Kombat: Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | NFL Bliz 20-03 |
| 12/31/02 | Defender<br>Dr. Muto<br>Freaky Flyers<br>NBA Basketball | Defender<br>Dr. Muto<br>Freaky Flyers<br>NBA Basketball | Defender<br>Freaky Flyers<br>NBA Basketball | Mortal Kombat: Deadly Alliance |

39. On April 30, 2002, the Company issued a press release wherein it reported its results for the quarter ended March 31, 2002. Therein, the Company reported that revenues during the quarter were $31,007,000, up from $23,723,000 in the prior year period. The pre-tax net loss during the March 31, 2002 quarter was $5,076,000 excluding preferred stock dividends and one-time charges associated with the consolidation of administrative facilities, compared with a pre-tax net

11

loss of $22,213,000, excluding $3,639,000 of one-time restructuring and other charges, in the prior year period.

40.     Importantly, the Company provided the following guidance:

**For the quarter ending June 30, 2002, Midway expects to ship nine new home videogame console products and anticipates net sales of $40 million to $50 million.** Midway expects a pre-tax loss of between $5 million and $10 million in the quarter ending June 30, 2002 prior to estimated preferred stock charges of $2,687,000 and excluding a one-time charge associated with the consolidation of administrative facilities from Corsicana, Texas estimated to be between $2.3 million and 3.0 million.

**For the full year ending December 31, 2002, Midway reiterates the previously stated guidance of net sales between $330 million and $340 million.** The Company also reiterates previously stated guidance for pre-tax income of between $49 million and $54 million for the full year, excluding one-time charges associated with the consolidation of administrative facilities from Corsicana, Texas estimated to be between $2.3 million and $3.0 million for the year, and prior to estimated preferred stock charges of $11.1 million. Due to net operating loss carry forwards, the Company does not anticipate incurring income tax expense in 2002.

The Company expects to ship at least 32 new home videogame console products during the remaining three quarters of 2002 across multiple platforms and genres. **Midway believes these products comprise the strongest home videogame lineup in the Company's history and that these products will produce record home videogame results in 2002.** Midway believes that the lineup of games it will present at the Electronic Entertainment Exposition (E3) convention in May to be among the strongest in the industry and include Mortal Kombat: Deadly Alliance, NFL Blitz 20-03, Freaky Flyers, Dr. Muto. (Emphasis added.)

41.     Further, the Company announced the following release schedule (bolded titles indicate insertion of a delayed product; parenthetical titles indicate either cancelled products or products delayed until the next fiscal year):

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 6/30/02 | Fireblade<br>Gravity Games BMX<br>Legion: Legion of Excalibur<br>MLB SlugFest 20-03<br>Red Card Soccer | Red Card Soccer | Gauntlet Dark Legacy<br>Gravity Games BMX<br>Red Card Soccer | SpyHunter |
| 9/30/02 | Mortal Kombat: Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | **Gravity Games BMX**<br>MLB SlugFest 20-03<br>Mortal Kombat: Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | MLB SlugFest 20-03<br>Mortal Kombat: Deadly Alliance<br>NFL Blitz 20-03<br>NHL Hitz 20-03 | NFL Bliz 20-03 |
| 12/31/02 | Defender<br>Dr. Muto<br>Freaky Flyers<br>TBA: Traveler's Tales Title<br>**(NBA Basketball)** | Defender<br>Fireblade<br>Freaky Flyers<br>**(NBA Basketball)** | Defender<br>**(Fireblade)**<br>**(Dr. Muto)**<br>Freaky Flyers<br>**(NBA Basketball)** | Mortal Kombat: Deadly Alliance<br>Gauntlet: Dark Legacy<br>Justice League<br>NHL Hitz 20-03 |

42.     The Company's earnings release was followed by a conference call during which Defendants reviewed the Company's performance.  With respect to the Company's guidance for the remainder of the fiscal year, Defendant Nicastro again reiterated:

> **For the quarter ended June 30, 2002, Midway expects to ship nine new home video game products and anticipates net sales of $40 to $50 million. . . . For the full year ending December 31, 2002, Midway reiterates the previously stated guidance of net sales of between 330 million and $340 million and pretax income of between 49 million and $54 million,** excluding one-time charges associated with consolidation of administrative facilities from Corsicana, Texas, estimated to be between 2.3 and $3 million and estimated preferred stock charges of 11.1 million. (Emphasis added.)

43.     Moreover, regarding the Company's outlook, Defendant Nicastro stated:

> **Looking more broadly at the industry's performance in the March quarter, we believe the results were solid and bode well for the rest of the year.** According to NPD group, software sales in the first quarter rose 26% while combined hardware and software

13

> dollar sales climbed 20% versus the same period last year. Sony's Playstation 2 continues to be the hardware market leader, selling through approximately 370,000 units in the first quarter compared to approximately 140,000 Xbox units and approximately 115,000 GameCube units. **For the full year 2002, we expect hardware and software sales growth consistent with most analysts' expectations.** (Emphasis added.)

Analyst expectations during the time period immediately before the conference call date of April 30, 2002 ranged from EPS estimates of $0.68 to $1.00, and FY02 revenue estimates of $338 to $400 million.

44. During the April 30, 2002 conference call, Defendant Nicastro also stated:

> Over all, we project video game software sales will grow between 20% and 30% in 2002. Midway is well position to do capitalize on this industry growth, with a broad portfolio of products all three next generation platforms and the GameBoy Advance. **This portfolio includes market-proven franchises and brands together with exciting new products which we expect will develop into new franchises for the future. This portfolio is deep.** We plan on introducing over 38 new home video game releases during the next three-quarters. It is also broad covering the most profitable genres in the industry including baseball, soccer, hockey, football, fighting, action, extreme games, racing adventure, RPG, and platform adventure. And perhaps most importantly, it is full of high-quality, innovative and fun games. **We expect that a number of these products can become breakaway hits.** (Emphasis added.)

45. Importantly, in response to analyst concerns regarding Midway's ability to promptly deliver Mortal Kombat, one of its most important products during the relevant period, Defendant Nicastro stated:

> **There's a handful of titles that as we're getting closer and closer to their introduction, our level of excitement and confidence in their ability to be strong sellers has been going up** Mortal Kombat is clearly one of them. I think that as time has gone by our management group is become even more bullish on what Mortal Kombat can ultimately do in the marketplace. It's looking terrific.

* * *

**Mortal Kombat is going to ship at the end of September, and
that's been the plan . . . since the beginning.** (Emphasis added).

46.    Moreover, in response to analyst concerns about whether the Company would meet its

year-end revenue targets, Defendant Nicastro responded:

> I think that the simple answer . . . is look at the product you sell,
> because that's -- the product is what's going to generate the profits. If
> we have a good product and it sells well, we're going to generate
> strong revenues and strong profits. And I think that that's kind of an
> easy one for you and for those who are at least able to attend the
> [upcoming Electronic Entertainment Exposition] show.

47.    On May 14, 2002, the Company filed with the SEC, on Form 10-Q, its quarterly

report for the first quarter ended March 31, 2002. The Form 10-Q, signed by Defendant Powell,

stated:

> Home videogame revenues increased 149% LU $30,265,000 for the
> three months ended March 31, 2002 compared to $12,138,000 for the
> three months ended March 31, 2001. The increase is primarily due to
> our strategy for the platform transition from 32 and 64-bit home
> videogame consoles to the new generation 128-bit consoles including
> Sony's Playstation 2, Nintendo's GameCube and Microsoft's Xbox.
> The three months ended March 31, 2002 primarily consisted of new
> generation console game sales as compared to the comparable prior
> period that consisted primarily of 32 and 64-bit console game sales.
> Because it takes on average 18 to 24 months to develop a title for a
> new generation console, Midway is not expected to experience the
> full benefit of this strategy until later in 2002.

48.    The statements referenced above in ¶¶ 33-47 were each materially false and

misleading because they failed to disclose and misrepresented the following material, adverse facts

which were known to Defendants or recklessly disregarded by them:

(a)    that the Company was experiencing material disruptions in its internal studios

such that it would be unable to meet the expected release dates for its major new game titles;

15

(b)    that the Company's inability to develop new game titles in a timely manner was negatively impacting its ability to increase revenues and earnings; and

(c)    as a result of the foregoing, Defendants lacked a reasonable basis for their earnings projections for the Company, which were therefore materially false and misleading.

49.    Then, on July 2, 2002, the Company announced that it was reducing its revenue and earnings guidance for its second quarter and full-year 2002 results. More specifically, the Company reported that it expected revenues for the quarter ended June 30, 2002 to be between $28 and $30 million, as opposed to the previous guidance of $40 to $50 million. Further, Midway reported that for the year ending December 31, 2002, it expected revenues between $295 and $310 million, as opposed to the previous guidance of $330 to $340 million.

50.    In the press release, Midway stated that the revised guidance was necessary due to the delay of products originally scheduled to ship during the quarter, as well as lower-than-expected sales of games launched late in the quarter. Most importantly, included among the delayed products was Mortal Kombat, which was pushed back from the announced release date of September 2002 to the first half of the quarter ending December 31, 2002.

51.    In response to the Company's revised guidance, Midway's shares fell over 51%, or $4.14 a share, to close at $3.85 per share.

52.    On July 31, 2002, the Company issued a press release wherein it reported its results for the quarter ended June 30, 2002. Therein, the Company reported that for the quarter ended June 30, 2002, revenues were $28.1 million and the pre-tax loss was $10.7 million excluding approximately $16.7 million of preferred stock charges and $0.5 million of charges associated with

16

the consolidation of administrative facilities from Corsicana, Texas. Moreover, the Company issued the following guidance:

> For the quarter ending September 30, 2002, Midway expects to ship ten new home videogame products and anticipates net sales of between $50.0 million and $55.0 million. Midway expects a pre-tax loss of between $5.0 million and $7.0 million in the quarter ending September 30, 2002 prior to estimated preferred stock charges of approximately $0.3 million and excluding charges associated with the consolidation of administrative facilities estimated to be between $0.2 million and $0.4 million.
>
> **For the year ending December 31, 2002, Midway reiterates the previously stated guidance of net sales between $295.0 million and $310.0 million.**
>
> <div align="center">* * *</div>
>
> Midway expects to ship 29 new home videogame products during the remaining two quarters of 2002 across multiple platforms and genres. **The Company believes these products comprise the strongest home videogame lineup in Midway's history and that these products will produce record home video game revenues in 2002.**

53.     Importantly, the Company announced the following release schedule (bolded titles indicate insertion of a delayed product; parenthetical titles indicate either cancelled products or products delayed until the next fiscal year)

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 9/30/02 | NFL Bliz 20-03<br>NHL Hitz 20-03 | MLB Slugfest 20-03<br>NFL Bliz 20-03<br>NHL Hitz 20-03<br>**(Gravity Games BMX)** | **Gravity Games Bike: Street.**<br>**Vert.**<br>**Dirt.**<br>MLB Slugfest 20-03<br>NFL Bliz 20-03<br>NHL Hitz 20-03 | NFL Bliz 20-03 |
| 12/31/02 | Defender<br>Dr. Muto<br>Freaky Flyers<br>Haven: Call of the King | Defender<br>Fireblade<br>**Mortal Kombat:**<br>  **Deadly Alliance** | Defender<br>Dr. Muto<br>Freaky Flyers<br>**Mortal Kombat:** | Defender<br>Gauntlet: Dark Legacy Justice League<br>MLB Slugfest 20- |

<div align="center">17</div>

| | **Mortal Kombat: Deadly Alliance** | | **Deadly Alliance** | 03 Mortal Kombat: Deadly Alliance NHL Hitz 20-03 |
|---|---|---|---|---|

54.     On August 13, 2002, the Company filed with the SEC, on Form 10-Q, its report for the quarter ended June 30, 2002.  The Company's Form 10-Q, signed by Defendant Powell, reaffirmed the Company's previously announced results.

55.     On October 29, 2002, the Company issued a press release announcing its results for the period ended September 30, 2002.  Therein, Midway reported that revenue for the quarter ended September 30, 2002 was $52.6 million.  The pre-tax loss for the quarter ended September 30, 2002 as $11.3 million, excluding $0.2 million of charges incurred with the consolidation of administrative facilities from Corsicana, Texas.

56.     Importantly, the Company also issued the following guidance, reiterating its fourth quarter projections and reducing its previously announced projections for FY2002 revenues:

> **For the quarter ending December 31, 2002, Midway expects revenue of between approximately $217.0 million and $267.0 million,** and pre-tax earnings of between a loss of approximately $12.0 million and a gain of approximately $13.0 million . . . (emphasis added).

57.     Furthermore, the Company announced the following release schedule, again announcing delays of various titles from prior announcements (bold titles indicate insertion of a delayed product; parenthetical titles indicate either cancelled products or products delayed until the next fiscal year):

| Quarter Ending | PlayStation 2 | GameCube | Xbox | Game Boy Advance |
|---|---|---|---|---|
| 12/31/02 | Defender Dr. Muto | Defender Dr. Muto | Defender Dr. Muto | Defender Gauntlet: Dark |

| | (Freaky Flyers) Haven: Call of the King Mortal Kombat: Deadly Alliance | Fireblade Mortal Kombat: Deadly Alliance | (Freaky Flyers) Mortal Kombat: Deadly Alliance | Legacy Justice League (MLB Slugfest 20-03) Mortal Kombat: Deadly Alliance NHL Hitz 20-03 |
|---|---|---|---|---|

58.     The Company's earnings release was followed by a conference call during which Defendants reviewed the Company's performance. Defendant Nicastro, commenting on the Company's projected revenues, stated **"we expect revenue for the December quarter will grow to $105 to $155 million, or 140 percent to 250 percent higher than last year."** (Emphasis added.)

59.     On November 14, 2002, the Company filed with the SEC, on Form 10-Q, its report for the quarter ended September 30, 2002. The Company's Form 10-Q, signed by Defendant Powell, reaffirmed the Company's previously announced results.

60.     On December 23, 2002, the Company issued a press release, once again announcing a revised guidance, stating that it expected revenues for the fourth quarter ending December 31, 2002 to be between $78.0 million and $83.0 million, compared to the Company's previous revenue guidance of between $105.0 million and $155.0 million. The Company attributed this decrease to lower than expected demand for Defender, Dr. Muto and Haven: Call of the King, which was only partially offset by higher than expected demand for Mortal Kombat: Deadly Alllance. Moreover, the Company announced that for the full year ending December 31, 2003, Midway expected revenues of between $250 and $275 million.

61.     On February 20, 2003, the Company issued a press release announcing its results for the quarter ended December 31, 2002. Therein, the Company reported revenue of $80.2 million and a loss applicable to common stock of $25.0 million or $0.54 per share in the quarter ended December

31, 2002. Revenue for the year ended December 31, 2002 was $191.9 million, and a loss applicable to common stock of $73.6 million or $1.61 per share in the twelve months ended December 31, 2002.

62. Importantly, the Company announced the following guidance:

> For the quarter ending March 31, 2003, Midway expects revenue of between $40.0 million and $45.0 million, approximately a 29% to 45% increase over revenue of $31.0 million in the first quarter of 2002. The Company expects a pre-tax loss of between $3.0 million and $5.5 million in the quarter ending March 31, 2003, excluding approximately $6.2 million of restructuring charges associated with the consolidation of product development operations in California.

> The Company expects two major product introductions in the quarter ending March 31, 2003 including the European launch of Mortal Kombat: Deadly Alliance for all platforms and the domestic launch of MLB SlugFest 20-04 for all platforms. The successful launch of Mortal Kombat: Deadly Alliance in Europe last week represented Midway's largest ship-in sales volume for one title since the Company opened its European office in 1999. **The Company also expects the launch of MLB SlugFest 20-04 to be very successful as preliminary consumer and retailer interest in the follow-up to last year's top-performing Playstation 2 baseball title is very strong.**

> **For the year ending December 31, 2003, Midway reiterates its previous guidance of revenues of between $250.0 million and $275.0 million,** an approximate 30% to 43% increase over 2002 revenues, with pre-tax earnings of between $20.0 million and $30.0 million, excluding any restructuring charges. (Emphasis added).

63. On March 28, 2003, the Company filed with the SEC, on Form 10-K, its report for the fiscal year ended December 31, 2002. The Company's Form 10-K, signed by the Individual Defendants, reaffirmed the Company's previously announced results.

64. On April 29, 2003, the Company issued a press release announcing its results for the first quarter ended March 31, 2003, wherein it reported revenues of $45.8 million. In terms of

guidance, the Company stated that it only expected $7 to $11 million for the second quarter of 2003. Moreover, Midway once again slashed its previous guidance for the year ending December 31, 2003, estimating revenues of only **$200 million and $230 million,** as opposed to the $250 to $275 it had previously announced.

65.     On May 15, 2003, the Company filed with the SEC, on Form 10-Q, its report for the quarter ended March 31, 2003. The Company's Form 10-Q, signed by Defendant Powell, reaffirmed the Company's previously announced results.

66.     The statements referenced above in ¶¶ 49-50, 52-65 were each materially false and misleading because they failed to disclose and misrepresented the following material, adverse facts which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was experiencing material disruptions in its internal studios such that it would be unable to meet the expected release dates for its major new game titles;

(b)     that the Company's inability to develop new game titles in a timely manner was negatively impacting its ability to increase revenues and earnings;

(c)     that the Company was experiencing decreased consumer demand for its released products; and

(d)     that as a result of the foregoing, Defendants lacked a reasonable basis for their earnings projections for the Company, which were therefore materially false and misleading.

## THE TRUTH BEGINS TO EMERGE

67.     On July 29, 2003, the Company announced its results for the third quarter ended March 31, 2003. To the shock of the investment community, Midway disclosed that it generated a mere $5 million, failing to meet even its paltry estimates of $7-11 million. The revenue decline was

attributed to the delay in the release of a number of titles. The Company also announced that David F. Zucker succeeded Neil D. Nicastro as Chief Executive Officer and President of Midway Games Inc.

68.     Midway's July 29th announcement shocked the markets, causing the Company's already depressed shares to slide downwards more than 28%, or $0.97 a share, to close at $2.42 per share on July 30, 2003.

### FRAUDULENT SCHEME AND COURSE OF BUSINESS

69.     This section pertains solely to claims predicated on Section 10(b). The market for Midway's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Midway's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Midway securities relying upon the integrity of the market price of Midway's securities and market information relating to Midway, and have been damaged thereby.

70.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Midway's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material, adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

71.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

22

damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period Defendant made or caused to be made a series of materially false or misleading statements about Midway's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Midway and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

<div align="center">

**SCIENTER**

</div>

72.     This paragraph pertains solely to claims predicated on Section 10(b). As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Midway, their control over and/or receipt of information of Midway's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Midway, participated in the fraudulent scheme alleged.

<div align="center">

23

</div>

**Applicability Of**
**Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

73.     This paragraph pertains solely to claims predicated on Section 10(b).  At all relevant times, the market for Midway's securities was an efficient market for the following reasons, among others:

(a)     Midway's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Midway filed periodic public reports with the SEC and the NYSE;

(c)     Midway regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Midway was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

74.     As a result of the foregoing, the market for Midway's securities promptly digested current information regarding Midway from all publicly available sources and reflected such information in Midway's stock price.  Under these circumstances, all purchasers of Midway's securities during the Class Period suffered similar injury through their purchase of Midway's securities at artificially inflated prices and a presumption of reliance applies.

24

**NO SAFE HARBOR**

75.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Midway who knew that statement was false when made.

**COUNT I**
**AGAINST ALL DEFENDANTS**
**SECTION 11 OF THE SECURITIES ACT**

76.     Plaintiff incorporates by reference the allegations set forth above in paragraphs 1-68 and 74.

77.     Each Defendant was either a signatory of the Prospectus, a director and/or officer of Midway, an underwriter for the securities sold in the Offering and/or a controlling person of the issuer. Defendants owed to the purchasers of the common stock of Midway, including Plaintiff and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus at the time that it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in

25

order to make the statements contained therein not misleading. As set forth above, the Prospectus contained misrepresentations of material facts or omitted to state material facts required to be stated in order to make the statements contained therein not misleading.

78.     None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

79.     Among other duties violated by Defendants as a result of the false and misleading statements that were made with no reasonable basis as described herein, Defendants failed to comply with Item 303 of Regulation S-K of the SEC's rules and regulations by failing to adequately disclose:

(a)     Any known trends or any known demands, commitments, events or uncertainties that would result in or that would reasonably likely result in Midway's liquidity increasing or decreasing in any material way; and

(b)     With respect to Midway's operations, any known trends or uncertainties that have had or that Defendants reasonably expected would have had a materially favorable or unfavorable impact on revenues or income from continuing operations.

80.     Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Prospectus and omitted to state material facts that were required to be stated in order to make the statements contained therein not misleading as set forth above. This misinformation continued throughout the Class Period. By reason of the conduct herein alleged, Defendants violated, and/or controlled a person and/or entity who violated, Section 11 of the Securities Act. As a direct and proximate result of Defendants' wrongful conduct, the market price for Midway's common stock was

artificially inflated in the Offering, and Plaintiff and the other members of the Class suffered substantial damages.

81.     This action has been brought within one year after the discovery of the untrue statements and the omissions or after such discovery should have been made by the exercise of reasonable diligence and within three years after the Midway common stock was offered to the public.

82.     Plaintiff and the other members of the Class purchased or otherwise acquired their Midway common stock without knowledge of the untruths or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by Defendants' misconduct and by the material misstatements and omissions of the aforementioned Prospectus.

83.     Defendants utilized national securities exchanges, the mails, telephones, and other instruments of interstate commerce in the offering and sale of Midway's common stock.

84.     By reason of the foregoing, Defendants have violated Section 11 of the Securities Act and are liable to Plaintiff and the Class.

## COUNT II
## AGAINST ALL DEFENDANTS FOR
## VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT

85.     Plaintiff incorporates herein by reference the allegations set forth above in paragraphs 1-68 and 74.

86.     Midway, the Individual Defendants, and the Underwriter Defendants were sellers of the Company's common stock within the meaning of Section 12(a)(2) of the Securities Act and either solicited and/or sold directly to Plaintiff and the other Class members Midway common stock.

27

87.     Defendants, in order to serve their own financial interests and/or those of the owner of Midway securities, sold and/or solicited the sale of Midway securities to members of the Class.

88.     Defendants owed to Plaintiff and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to insure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

89.     None of the false and misleading statements and omissions contained in the Prospectus and described herein were known to Plaintiff and the other members of the Class at the time they acquired Midway's common stock.

90.     This action has been brought within one year after the discovery of the untrue statements and the omissions or after such discovery should have been made by the exercise of reasonable diligence and within three years after the Midway common stock was bona fide offered to the public.

91.     By reason of the conduct alleged herein, Defendants violated Section 12 of the Securities Act. Accordingly, Plaintiff and the other members of the Class who hold their common stock have the right to rescind and to recover the consideration paid for their Midway common stock and, hereby elect to rescind and tender their Midway common stock to Defendants sued in this Count. Plaintiff and Class members who have sold their common stock are entitled to rescissory damages.

## COUNT III
## AGAINST THE INDIVIDUAL DEFENDANTS FOR
## VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

92.     Plaintiff repeats and realleges the allegations contained above in paragraphs 1-68 and 74.

93.     This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

94.     The Individual Defendants are control persons of Midway by virtue of their position as directors and/or senior officers of Midway.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Midway.

95.     The Individual Defendants knew of or recklessly disregarded the violations of Section 11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed the Prospectus and having otherwise participated in the process which allowed the Offering to be successfully completed.

### COUNT IV
### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT AND RULE 10b-5
### PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     Throughout the Class Period, Midway and the Individual Defendants, carried out a plan, scheme, and course of conduct that was intended to and did:  (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Midway's securities; and (iii) cause Plaintiff and the other members of

the Class to purchase Midway's securities at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct, Defendants took the actions set forth herein.

98.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Midway's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

99.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §§ 210.01 et seq.) and Regulation S-K (17 C.F.R. §§ 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, and earnings so that the market price of the Company's securities would be based on truthful, complete, and accurate information.

100.     Midway and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material, adverse information about the business, operations, and future prospects of Midway as specified herein.

101.     Defendants employed devices, schemes and artifices to defraud, while in possession

of material, adverse, non-public information and engaged in acts, practices, and a course of conduct

as alleged herein in an effort to assure investors of Midway's value and performance and continued

substantial growth, which included the making of, or the participation in the making of, untrue

statements of material facts and omitting to state material facts necessary in order to make the

statements made about Midway and its business operations and future prospects in the light of the

circumstances under which they were made, not misleading, as set forth more particularly herein, and

engaged in transactions, practices and a course of business that operated as a fraud and deceit upon

the purchasers of Midway's securities during the Class Period.

102.     The Individual Defendants' primary liability, and controlling person liability, arises

from the following facts: (i) the Individual Defendants were high-level officers and/or directors at

the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in

the creation, development and reporting of the Company's internal budgets, plans, projections and/or

reports; and (iii) the Individual Defendants were aware of the Company's dissemination of

information to the investing public that they knew or recklessly disregarded was materially false and

misleading.

103.     Defendants had actual knowledge of the misrepresentations and omissions of material

facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and

to disclose such facts, even though such facts were available to them. Such Defendants' material

misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and

effect of concealing Midway's operating condition and future business prospects from the investing

public and supporting the artificially inflated price of its securities. As demonstrated by Defendants'

overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

104.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Midway's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Midway's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material, adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Midway securities during the Class Period at artificially high prices and were damaged thereby.

105.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Midway, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Midway securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

106.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder.

107.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT V
## VIOLATION OF SECTION 20(a) OF
## THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

108.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

109.    The Individual Defendants acted as controlling persons of Midway within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

110.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

33

111.   As set forth above, Midway and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Midway and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(1)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(2)   Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(3)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(4)   Awarding rescission or rescissory damages to members of the Class who no longer hold Midway shares; and

(5)   Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:   October 7, 2003

Respectfully submitted,

**MUCH SHELIST FREED DENENBERG**
**AMENT & RUBENSTEIN, P.C.**


*Carol V. Gilden*

Carol V. Gilden
Michael E. Moskovitz
191 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 521-2000
(312) 521-2100 (facsimile)

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Sandy A. Liebhard
Joseph R. Seidman, Jr.
10 East 40th Street, 22nd Floor
New York, NY 10016
(212) 779-1414
(212) 779-3218 (facsimile)

**Attorneys for Plaintiff**

35

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Ezra Birnbaum ("Plaintiff"), declare the following as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard & Lifshitz, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group.  A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.      Plaintiff's transaction(s) in the **MIDWAY GAMES INC.** security that is the subject of this action during the period of 12/11/01 through 7/30/03 are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 100 | MWY | Buy | 7/31/02 | $4.32 |

Please list other transactions on a separate sheet of paper, if necessary.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for the class in any action filed under the federal securities laws except as indicated here:
Birnbaum v. Audrx Corp. (SD Fl) 02-60466
Birnbaum v. Merck & Co. (D. NJ) 02-3241 (MLC)
Birnbaum v. Verizon (SDNY) 02-CV-7294
Birnbaum v. TXU Corp. (N.D. Tx) 02-CV-2243-M
Birnbaum v. Terayon Communications (C.D. of Ca.) 00-03912
Birnbaum v. Hertz Corp. (Ch. Ct of Del) 18337NC
Birnbaum v. Nortel Networks (EDNY) CV 01 1033
Birnbaum v. Tivo, Inc. (Supreme-Kings) 9585/01

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of October, 2003.

_____
Signature

_____
Print Name

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

EZRA BIRNBAUM

## DEFENDANTS

MIDWAY GAMES, INC., et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Kings County
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Carol V. Gilden/Michael E. Moskovitz
Much Shelist Freed Denenberg
Ament & Rubenstein, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606  (312) 521-2403

ATTORNEYS (IF KNOWN)

03C 7095
MAGISTRATE JUDGE MASON

JUDGE HOLDERMAN

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

Appeal to District
Judge from
☐ 7 Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☒ 850 Securities/Commodities/Exchange |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. Sec. 78(j)(b) Action for Securities Fraud

DOCKETED
OCT 8 2003

## VII. REQUESTED IN COMPLAINT

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ YES  ☐ NO

## VIII.

This case  ☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____ , previously dismissed by Judge _____

DATE
10/7/03

SIGNATURE OF ATTORNEY OF RECORD
Carol V Gil

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of     EZRA BIRNBAUM, et al. v. MIDWAY GAMES, INC., et al.

Case Number: **03C 7095**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

ERZA BIRNBAUM

*JUDGE HOLDERMAN*

*MAGISTRATE JUDGE MASON*

| (A) | (B) |
|---|---|
| SIGNATURE *Carol U Gilder* | SIGNATURE *Michael E. M...* |
| NAME Carol V. Gilden | NAME Michael E. Moskovitz |
| FIRM Much Shelist Freed Denenberg Ament & Rubenstein, P.C. | FIRM Much Shelist Freed Denenberg Ament & Rubenstein, P.C. |
| STREET ADDRESS 191 N. Wacker Drive, Suite 1800 | STREET ADDRESS 191 N. Wacker Drive, Suite 1800 |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP Chicago, IL 60606 |
| TELEPHONE NUMBER (312) 521-2403 | TELEPHONE NUMBER (312) 521-2729 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06185530 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6237728 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☒ | MEMBER OF TRIAL BAR? YES ☐ NO ☒ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☒ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☐ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

**DOCKETED**
OCT 8 2003

03 OCT -7 PM 4: 22
U.S. DISTRICT FILED

PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.